The case for this morning will be Community Bank of Trenton v. Schnuck Markets. May it please the Court. Good morning, Your Honors. My name is John Driscoll. I represent the Plaintiff Appellants in this case. Specifically, Plaintiff Appellants include a putative class of banks. Specifically, the putative class reps include small community banks and credit unions. So I had a question about that, though. If the problem here is in the security of the payment system that the grocery chain is using, why wouldn't your potential class include virtually everyone in the world who's issued a Visa card or a MasterCard and go to France and have la carte bleue and, you know, it's a Visa? That's a pretty big class. It may indeed, Your Honor. I simply represent the banks that issued the cards that were affected. That's the class that we seek to represent. I don't quite understand what you mean. So these banks had particular customers who shopped at these stores and you've traced those cards back to these particular banks? Yes, ma'am. It's estimated that 2.4 million cards were affected. Right, right. So that is the class, if you will. Well, it's quite more narrow than that, but those were the affected cards. A narrower class would be those banks that issued those cards and suffered damage. Surely that's a fair number. No one has a Citibank-issued card who shops at these stores? No, there may indeed, but it is a finite class. I mean, I am not disputing that it may be large, but it is finite. It is simply the issuing, the banks that issued the cards affected. In fact, I will represent, I do not know the extent of the class at this point. Discovery would reveal that, though. Thank you, Your Honor. And so, you know, getting right to it then, and thank you for the question. What happened here was in December of 2012, Schnucks Markets security system was breached. It was breached for the period of about 119 days. The last two weeks of which, a little more, Schnucks knew that this breach had occurred, but notified no one. So given all of that, I mean, we've certainly seen cases in which the customers of somebody like Schnucks have brought this kind of action. But it looks to me, and your opponents argue, that the network of contracts that allow the payment process to happen, contracts between, you know, the merchant and its bank and over to the issuing bank and over to you, and they even say in their brief, but maybe you can comment on this, that there are, yeah, this is the bottom of page three, the top of page four of the red brief, that if there's a problem, the customer's accounts are going to get credited, and then the card brands can reimburse the issuing banks for assessments, and the acquiring banks have indemnification. It sounds like there's a very well-thought-out system of risk allocation, I guess I should call it. No one is free. And here you're coming along, not as a customer, but saying we want even more reimbursement. I understand, Your Honor. I'm very well aware of that, and I have several things to say in response. First of all, did you find that statement in the red brief an accurate depiction of the way the process works? I find it a mere characterization. There's nothing in the record on that issue that's a mere characterization. The record here is we're at 12B6. No, I understand, you're 12B6. So this is a mere characterization. Maybe that's so. So possibly you would have no injury. If your indemnification rights were robust enough, you might have no injury at all. Well, there's one other important point that I haven't got to, and that is that my clients are not party to any contract with the defendant. Of course not. But that's why Judge Wood was asking about the network of contracts. We're not talking here about strangers. We're talking about some of the most sophisticated and elaborate networks of contracts in the modern global economy. I understand. I view that, Your Honor, as a little bit of a red herring because, again, those contracts, though mentioned, they're not in evidence. They're not part of the record here. Were they presented to the district court? There was excerpts from various contracts, not complete contracts, included in the record. Did you disagree with what was presented to the district court? I disagree with it to the extent that it's incomplete and only discovery will reveal. Did you provide the complete contracts? Presumably not in my possession. Your clients presumably are parties to the Visa and MasterCard networks, right? They are. Yes, they are.  Yes, they have. Do they keep copies of those contracts? They have. Do they give them to you? They have not. Did you ask? You know what? I'm not 100 percent sure of that. They may have given those to my associate, but they're not relevant. They're a red herring. They don't bear upon the losses between my clients. Well, let's just try your tort theory of negligence. Yes, Your Honor. And the issue of duty here, whether a retailer owes a duty in tort law to the banks that issue cards to its customers, right? Right. We want to worry about, if I remember correctly, your list from the Illinois Supreme Court.  Yes, Your Honor. Likelihood of harm, consequences of putting the burden on the defendant, and the magnitude of that burden, all kind of least cost avoidance sorts of issues that we're familiar with from 1L classes in tort law, right? Certainly the last two elements, yes. So those all seem to be issues that, when we're talking about complex economic activity, can be addressed by contract. We turn to tort law when we're talking about externalities, costs on third parties, on strangers. Where's the stranger here? Well, I think what you're getting to is the relationship between the parties, which is another consideration. And also the economic loss doctrine, which is looming in this case. Well, but it doesn't apply here for the reasons we've outlined in our brief. And that is that we're talking about a service here, not a product. So there's no qualitative defect product at issue. There's a service. There's no contract that governs duty between these parties, because these parties do not have contracts. That's why these extra contracts in this network that they mentioned is a little bit of a red herring. There may be those agreements. They're not part of the record here. But there's certainly no contract between my class of plaintiffs and the defendant. So let's talk about something a little less novel than data breaches, but a situation that seems at least roughly similar to me in this choice between contract and tort or some combination. A big construction project. The HVAC sub-subcontractor on a big project may or may not have any contractual relationship with the people who are going to be doing the roofing down the line or who knows. But they're not going to be direct contractual relationships. We know that if one sub-contractor really screws up the job it's doing, it is very likely to cause foreseeable harm to a bunch of other people involved in that project, right? Yes, Your Honor. We don't do that by tort law. We handle those issues through contract law, right? Well, you know, it's hard for me to say in your hypothetical whether we do or we do not. Take my word for it. Those are governed by... Okay, I will. Take a look at any big construction project dispute. Okay. If something like that goes wrong, you're going to have a complicated network, you know, the eye-numbing fine print of indemnifications and cross-indemnifications and insurance policies. That may in fact be the case, but what I don't know in your hypothetical is, are all of the parties contracted parties with one another? Because, again, my client is not contracted. One sub-subcontractor does not have a direct contract with a sub-subcontractor in another profession, but they're all part of this network of contracts. So forgive me, I'm not understanding how parties that have no contract with one another will resolve their dispute contractually. Through the indemnification provisions that sort out the kinds of risks that are foreseeable and substantial in this big, complicated, voluntary economic activity they undertake. So I guess my response would be it sounds like the devil is in those details, but we don't have those details in 12b-6. But counsel... We don't have these contracts. To go back to the very first part, you're saying, well, you don't know, but in the end, I mean, the very first thing is, is there any damage? And in talking about this system of contracts and indemnification, which your opponent referred to, part of a duty and part of any basis for bringing your claim is that contract or tort is that you allege that you actually have some damage. According to what presumably you should know whether your issuing bank is going to be indemnified by the reciprocal bank or the... and how that apparently there's a whole system of banks. If they're going to be indemnified, there's no reason for them to be going against Chinooks. Well, Your Honor, if they have... I can represent to the court they have not been indemnified. Okay, that has not happened. If you can accept my representations, again, that's not part of the record. Everything we're talking about is not part of the record. To your point about damages, we have alleged damages. We suffer damages. They are the cost of reissuing, canceling all cards, reissuing 2.4 million cards and the cost associated with that, which is not small. In addition, eating the costs of the cards that were actually compromised and accessed. Again, not insignificant costs. There was consumer litigation. In fact, there was an MDL for the consumer litigation. In that litigation, the damages were estimated to be somewhere in $70 million. So there are significant damages here because my clients are the ones that ate those costs. My specific client, Community Bank of Tretton, has not been indemnified. But it still doesn't answer why this isn't something that you already have handled through this network of contracts, through the share that you get for the costs of processing credit transactions. Banks that issue credit cards are not in the charity business. They do this because they earn money from the cards, whether it's through merchant fees or whether it's through interest or whether it's through annual assessments. There are a variety of ways that cards bring money home to the issuer. And you're coming in and saying that somehow this network of contracts isn't enough. And I have the same questions in my mind about the use of the tort system versus contract that Judge Hamilton was talking about. I also would like you for a minute to discuss your subclass that is raising a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act because there's got to be some link, at least, to consumer injury. And you're essentially making a business injury claim, it seems. Well, under the Illinois Consumer Fraud Act, parties that are persons, quote-unquote persons, are standing under that act. Businesses like this are persons as defined under that act. Right, but the Illinois courts have said for a non-consumer to have a cause of action, you've got to show conduct that implicates otherwise. Somehow or another, I'll just rephrase, implicates consumer protection concerns. And it seems as though the consumers are taking advantage of those tools for themselves. There's almost a double recovery problem. If you're trying to get out there and protect the consumers and they're out there getting a multi-million dollar, you know, tens of millions of dollars in settlement, you know, at some point there's duplication. And the real essence of your complaint is business loss, not consumer loss. Well, I would suggest that they're intertwined, Your Honor. Forgive me if I misled the court and created the assumption that the consumers have recovered $70 million. They have not. Under decisions like Spokio and the like, of course, we know that they only have standing to bring cases for their actual injury. Where the banks have eaten most of that cost, their actual injury is smaller, if any, in some instances. And in a sense, did the banks already insure themselves against this? I mean, look, even merchants have lost reserves and they lose money from shoplifting, from dishonest employees. They lose money sometimes. They may or may not. I don't know. But the question is, why is this a consumer fraud case? Because the interests of the consumer are intertwined with the bank. They are together. They are serving the interests of their patrons by issuing them a card that has both proprietary information of the banks and unique identifying information that belongs to the consumer on the card. Both are being stolen, by the way, when a data breach occurs. Account numbers that belong to the bank, Social Security numbers that belong to the consumer. So there is an intertwined interest of both consumers and banks in this set of facts. But you're not bringing your case on behalf of the consumers. I was involved in the consumer litigation. That has resolved. This case remains. The MDL. I'm sorry, Your Honor. Go ahead. I was just going to say the MDL, the JPML order under 1407, coordinated and consolidated only the consumer aspect of litigation, not this litigation. Okay. Could I ask you quickly about your theory under the Illinois Personal Information Protection Act? Yes, Your Honor. My basic question is how you alerted Judge Reagan that you actually were relying on that theory. As you know, under 12b-6, in pleading a case. My question is not whether you pled it sufficiently. My question is whether you argued it to Judge Reagan. Well, I don't know that we argued it well. We did argue the Illinois Consumer Fraud Act and all. Did you? Yes, Your Honor. What's the best indication in the record that he should have realized you had such a theory? The facts, Platt. But in your argument, didn't you just most, you really didn't argue it, did you? Well, I mean, the facts support it. Counsel, as a general rule, look, as a general rule, in our adversarial system, we expect counsel to make a coherent legal argument if they expect the court to address it. I didn't see it in your district court papers. If I've missed something, that's why I'm asking you the question. Yes, Your Honor. As I was mentioning earlier, we pled facts that support it. Did we invoke the BIP or PIPA, as it's affectionately called? No, we didn't invoke that name. But the facts, as I mentioned earlier, where the consumer information and the bank information is intertwined, proprietary information by the bank, i.e. the account numbers, proprietary, if you will, information of the consumer, i.e. Social Security numbers. It's asking a lot of the district judge to dream up whatever legal theories the facts suggest without any help from counsel once the 12B6 motion has been filed. We ask the court to do only what it's required to do under 12B6, Your Honor. But the court is also entitled to assume that once, now that it's on the table, that you will say, well, we've pled facts that might support this theory or that theory or the other theory. We don't have to plead theories. We all understand that. But you didn't do that, it seems. We felt that we did, Your Honor. Thank you. Well, if you'd like to save a little time, that's fine. Thank you. Mr. Warren. Good morning, Your Honors. May it please the court. Mr. Warren, if I could get you to start with the Illinois Consumer Fraud Act, I would like to do that because it's quite a broad statute. And as Mr. Driscoll just pointed out, it refers to any person who suffers actual damage. These data breaches certainly did take money out of the pockets of the banks that issued the cards because there are all sorts of things that say you've got to pay. There are things that say, you know, you're going to make your customers good for this. And it's easy for me to see the joint interest. The joint interest is in getting merchants such as Schnucks to put best practices in place, follow the visa guidelines and the MasterCard guidelines because everybody wins if they do that. And there may actually almost be a moral hazard for the grocery store chain or anybody, any merchant, if they don't suffer any financial damage. Well, Your Honor, I think the moral hazard issue is taken care of in part by the network of interrelated contracts that you were discussing earlier and under which Schnucks and any other merchant has certain responsibilities. But that's why I was asking about what you said at page 3 and 4 of your brief. You left me with the impression that the issuing bank, so plaintiffs, they're the issuing bank, credit the customer accounts for the unauthorized transactions. Then you say the card brands. I'm not sure what that means. The Visa Network? Who's the card brands? The card brand, and both sides I think use the same terminology, refers to the Visa and MasterCard respective networks. Okay, so plaintiffs, the issuing banks, are going to credit their customers' accounts. I understand that. That's been the law for a long time. Correct. So they're out, you know, a million dollars. Sometimes I'll just use a simple number because they credited the customer accounts. At that point, are you telling me that Visa pays the issuing bank a million dollars to cover the cost of the consumer protection? Under the rules that Visa issues and that MasterCard separately issues, and the plaintiff has referred to those as the card brand rules, yes, Visa will recover from the acquiring bank that sponsored the breach merchant. Right, that's the bank that's right next to the merchant. Correct. In this case, it was Citicorp. So Visa goes to the acquiring bank, Citicorp here, and says, give us a million dollars because we'd like to give it back to the issuing bank, which has made the customers good. Yeah, under the rules, they have the ability to go to the acquiring bank, make an assessment against that bank, and then that acquiring bank has a contract with the breach merchant, typically including indemnification provisions. Right, that's what you say. Acquiring banks generally have. Isn't this down in the weeds? Isn't this the kind of thing that ought to be handled at summary judgment as opposed to 12B6? Well, in our view, Your Honor, no, because it doesn't really matter what the details of those arrangements are. What matters, I believe, is that those arrangements exist. Why does it not matter that the details are there? Because you're trying to piggyback on the consumer protection concerns that flowed from this data breach. And if there aren't any, if it's as Judge Bucklow suggested, maybe there's no real injury at all to the financial institutions. Maybe there is, but don't we need to explore that? Well, only if there is a cause of action here, Your Honor, and as far as the common law negligence claim goes, there isn't one because there's no duty to safeguard personal information in either Illinois or Missouri. And that's because of CUNY? In Illinois, it's because of CUNY, yes. In CUNY, the court said, and it was citing Illinois Supreme Court precedent, where there is no duty, there is no negligence. The plaintiff's approach to this would actually turn that proposition on its head by basically saying wherever there's negligence, there must be a duty. But there is a duty under the Illinois Consumer Fraud Act not to engage in, among other things, deceptive business practices. We have this two-week period after Schnucks knew that there had been this massive data breach. They'd already hired somebody to look into it. They stay mum for that two weeks. People continue like innocent lambs to use their cards in this store. Why isn't that something that at least as to those banks that are in Illinois and under the protection of that law, why shouldn't that go forward? The jurisdiction of the consumer fraud statute in Illinois is limited to cases that have a meaningful consumer nexus. Right, and that's what I'm saying. Why doesn't this have a meaning? The bank and the consumer are absolutely aligned in their interest in having the merchant follow the visa rules or the MasterCard rules for data protection. I think the simple answer to that question, Your Honor, is that the consumers have already been reimbursed. And for that, you don't need to go outside the record. Let's suppose they were not. Would you think the consumers might have a claim under the Illinois Consumer Fraud Act? Conceivably, they would. But they certainly would get past the consumer nexus requirement. But on the theory that this is, in essence, deceptive conduct at some point, and with assurances that businesses compete on the basis of keeping data secure at this point. And I'm certain that among the many cases that were MDL'd in the consumer litigation here, they certainly had the opportunity to raise claims under that act or other states' consumer fraud statutes. But we've recognized harms beyond the fact that maybe you have a phony $100 charge on your visa. We've noted that people have to spend a lot of time. They need to change automatic payments. They need to take other measures. Maybe they need to subscribe to a credit protection service. So whether they've been fully reimbursed by the fact that they're not stuck with the phony charge is a different question. Looking at the complaint in this case in paragraph 80, the plaintiff alleges with referring to themselves as issuing banks, and I'm quoting from paragraph 80, there is no other foreseeable group of parties that could be injured by a data breach when compromised payment cards must be canceled and reissued, et cetera. So the way they have pledged their claim, they are the ones who are injured. They have reimbursed their consumers or their customers. Yeah, and they say we're left holding the bag. And they say they're left holding the bag, and yet they are voluntarily participating in a network that is heavily regulated by contracts that relate with each other. Yeah, but if they really are left holding the bag, why can't they seek indemnification from the party whose carelessness led this whole thing to happen? The bag they claim they are left holding is one, if it exists at all, is one that they bargained for when they chose to be part of this network. I think we can assume they're left holding the bag here. Crooks made off with millions of dollars in fraudulent charges, right? That loss falls somewhere. The loss falls somewhere, and the way in which that has been weeded out among all the different participants in this network has been regulated by the card brands, and that includes a number of arrangements that have been agreed to here. So the issuing banks are certainly paying their customers for their fraudulent charges on their credit cards and their debit cards, but they're also receiving from Visa and MasterCard, at least the way the system is set up, payments that Visa and MasterCard have the opportunity to recover from the bank that sponsored Shooks. I may not get this acronym right, but DSS, PCI, have I got that right? PCI, DSS. PCI, DSS, sorry, okay. Everything in this area is in that area. Those standards, whatever they are. Is it your theory, Mr. Warren, that your client has any legal duty to comply with those standards? Yes. And under what source? And that is in the master services agreement between Shooks and its acquiring bank, which was Citicorp, which is part of the record before you. At one point plaintiffs were making a third-party beneficiary argument with respect to that contract. They have dropped that for the purposes of this appeal, but it's part of the record. And that contract requires Shooks, as a merchant, to comply with the card brand rules. The card brand rules set forth the PCI, DSS data security standards for the payment card industry. So who can sue Shooks when they don't do that? They allegedly failed to comply with these rules. That's what the complaint asserts. Yes. Now, who did sue them? All the consumers. The consumers did. But why couldn't Citibank, for example, sue them? Citibank did too. Okay. Well, so these people are in line because the law keeps pushing down the road. We've touched all the bases here. Good. There have been objectors to the settlement that sued, and this lawsuit was filed on two separate occasions. Right. Can we turn for a minute to the Illinois Personal Information Act? Now, the delay in notice, the two weeks, it does say the information is to or the duty is to the owner or licensee of the information. Is it your position that the plaintiffs here are not owners or licensees? That's correct. They are not. They are banks that issued cards to those people. But surely they have an interest in the integrity of their cards. How can you say they don't own any of the information on the card? Well, they don't have the card belongs to the person to whom they issued it. But it has a number. A number, yeah. It has a bank account number. It probably has other bank identifying information. Otherwise, it wouldn't work as a card. I mean, of course, this is the pre-chip era, which is another thing. Right. But when you swipe the card, it's encoding bank information just as much as it's encoding individual information, or you would never know which bank to go to. It does have that information. Yeah. As you pointed out during the previous argument, this is not a claim that was raised below. It's not easily suggestible by the allegations that were made here. If I could return to the network of contracts that we've been discussing, I think it's worth pointing out that the plaintiffs in this case have specifically alleged in paragraph 30 that Schnucks was at all times, and I'm paraphrasing slightly, obligated by contract to comply with the card grant rules and to comply with the PCI DSS data security standards. As the merchant that accepted these cards, Visa, MasterCard. Right. So they are relying on the contractual obligation, which Schnucks has as part of this network. But they are also arguing that the duty to exercise prudence with respect to their card-accepting practices, that that's all somehow a service, and so it's an extra contractual duty, and so it falls outside the scope of the economic loss doctrine. They are arguing that, and I don't think that argument holds water. Schnucks is not in the business of providing data security. They are a grocer. They sell not intangible products. They sell food. So why would anybody come into Schnucks with anything but cash? I mean, that would really limit your market today. There are some people who don't even know what cash is anymore. You know, the interactions that Schnucks has with the plaintiffs here, it is they, it is Schnucks who pays for the privilege of accepting their card. Well, that's right, because if you accept cards, whether they're credit cards or debit cards, you vastly expand the universe of people who are willing to go to your store because a great number of people don't like carrying around huge amounts of cash. Yes, and certainly, you know, there's no dispute that merchants choose to participate in this network just like the issuing banks do. I mean, this is a multi-billion dollar industry. And the point I'm trying to make is that the entire duty here that is being asserted, which is you, Schnucks, did not comply with PCI DSS standards, is one that is founded in the contract. Well, that duty may be. That's why I keep going back to the Illinois statute. I think you need to convince us that there isn't at least enough of an implicit consumer interest to this to bring it into this rather wide language. Like in the Bank One Milwaukee against Sanchez case, for example, the Illinois appellate court says that the statute covers conduct that involves trade practices that otherwise implicate consumer protection concerns. And it seems to me pretty unrealistic to say that this is not such a practice. Your Honor, you started off by referring to a potential moral hazard, and I responded by saying there is a heavily regulated contractual network here that deals with that, not to mention all the consumer lawsuits that Schnucks had to defend. But maybe Illinois wanted belt and suspenders. They passed the statute, whether they should have or not. So I think we have to deal with the complaint as pled. And as pled, all of the losses that the consumer suffered have already been reimbursed by these plaintiffs. And that's what they say in paragraph 80. And therefore they, as businesses, as banks that include potentially Citibank and Bank of America. But that's not the question. Is this a trade practice that implicates consumer protection concerns? It's not now that we've identified those concerns, have they been addressed? I think that, too, would be for later on. This is surely a practice that implicates. And if it was being raised by the consumers, then that would be the direct point of issue. That gets away from the fact that the Illinois law sometimes lets businesses sue. That's what this whole doctrine is all about. If you're a consumer anyway, you don't have to jump through all those hoops. And yet the outcome of this case is not going to have any effect on those consumers unless one wants to engage in sort of an attenuated. Well, if the outcome of the case is to induce merchants in Schnucks' position to take seriously their obligations to have data security, then consumers are certainly benefited by the litigation. They're the front-line people benefited by the litigation. But all that is at issue here is who is going to pay for the reimbursement that they already received. Well, but again, you're defining reimbursement just to mean the sum total of the bad charges. I am, but so is the plaintiff in Paragraph 80 of their complaint. With respect to their own damages, they've gone way beyond that. They're talking about people have to spend time processing new cards and the cost of issuing 2.3 million new cards and all this other stuff. Way beyond just that we had to pay somebody for the $100 bad charge. The incentive, I mean, I think what you are saying is this case may help to create an incentive for merchants to comply with their data security standards. Yeah, tell me why that's not true. And that incentive is already amply taken care of. I mean, but in many more direct ways, by the contractual obligation, which they plead that Chinooks has to comply with those standards, that contractual obligation is owed to their acquiring bank who might be on the hook for the assessments that are then used to reimburse the issuing banks. Chinooks is a pretty big operation, right? It's about five states, right? Yes, and it's a large... A hundred-some-odd stores? Correct. And Chinooks also and other merchants also have that same incentive established by the significant liabilities they face by consumers who are in a much more appropriate position to raise consumer fraud concerns. Well, that may be, but if Illinois has decided to open the door further, then it's not really up to us to shut it. You know, we have not seen, cited by the plaintiff, any case law that would suggest you can go this far. I mean, you can always find a consumer interest in any business dispute because at the end of the day there's going to be some customer for some business that's dealing with those entities. And that is the case here as it would be in any other business litigation. But this is business litigation. This is litigation over who has to pay the consumers, not whether the consumers get paid, but who has to pay them. And I don't think that's an appropriate place to impose consumer fraud liability or you would lose any meaning to this requirement of a consumer nexus. With respect to the economic loss rule, and that would be with respect to the negligence claim, obviously, the fact that they are alleging that Chinooks has a contractual obligation to comply with PCI standards, and the fact that the only duty that they are claiming that Chinooks breached is essentially the duty to comply with those standards. I take it the record doesn't tell us whether one of these potential assessments was ever made against Chinooks as a company by the banks? There is some reference to that in the briefs, Your Honor, and also in some of the case law because the litigation that Chinooks had with its acquiring bank ended up on appeal in the Eighth Circuit, and so there's an opinion about that. And there was some indemnification that Chinooks acknowledged under those contracts. There was litigation over the extent of that indemnification. But the economic loss rule applies even under their interpretation, which I think is incorrect. They basically say in Illinois and Missouri, the economic loss rule does not apply any time there is a duty independent of contract. In fact, the economic loss rule is much more expansive than that in both Illinois and Missouri. But even if the standard were as they say, they don't meet it because the duty that they are alleging was breached here is a duty that is found in the contract by their own allegations. In fact, in paragraph 137 of their complaint, they've asked the courts, this court and the district court, to issue an injunction that would require Chinooks to comply with those car brand rules and those contracts and the standards that are set forth in those contracts. So the whole, if you look at the Congregation of the Passion case in Illinois from the Supreme Court, or this court's case is interpreting that, the whole reason for allowing a party to plead around the economic loss rule is if there is a professional service provider... Well, sure. I mean, if you're a lawyer, yes, you have a contract with your client, but you have other obligations from... It's hard to spell out in that contract what it means to be a good lawyer. Here we don't have that situation. The PCI standards are written down. They claim that we didn't follow them, and that's a contract-based duty from which they are trying to extract a tort remedy. And I think that's the basic problem with this case as it relates to the common law claims. As it relates to the Consumer Fraud Act statute, I would just ask the court to consider where do you end up drawing the line and what isn't a consumer nexus. Okay. All right. Thank you very much. Thank you. Anything further, Mr. Driscoll? Yes, Your Honor. Three minutes, if I may. Whatever you saved. Yes, Your Honor. Just very quickly, it's very clear to me that the defendant is trying to wrap everything into these contracts, contracts, again, that are not part of the record here at 12b-6. But they're referred to all over the place in the complaint. They are, but my clients may have contracts for insurance. They may have contracts for all sorts of things. We don't know that they're germane to this happening. That is hashed out in the case as it proceeds. How could they not be germane? It may or may not be. This is sort of a hide-the-ball aspect to it. We're going to talk about all these contracts but not tell the court what they say. Usually contracts like that are appended to the complaint. Insurance policies are, you know, this kind of contract. Well, again, Your Honor, things are getting conflated, I'm afraid. There is no contract between my clients and the defendant they see. We know that. We know that there's a chain. Right. And so my client may have contracts with many parties that, you know, maybe they apply, maybe they don't. The singular point is that they're not part of the record here. We don't know what they say, whether they apply, what they cover, what they don't. Maybe they cover losses here, maybe they don't. Maybe they're a collateral source to be considered. Maybe they're not. These things will reveal themselves once the case proceeds. Now, is it your position that once all was said and done against the backdrop of all this litigation that's happened, that the consumers, the actual people who went to the grocery store to buy food, have been made whole in the wake of this breach? Well, that's a subjective thing, I guess. I mean, there has been a settlement, a consumer settlement in the city of St. Louis that Schnucks has participated in. I know there was some opt-out litigation that followed that. I mean, it would be, you know, it's hard for me to answer whether they've been made whole or not. Okay. I did want to mention also— And what monetary benefit—I'm thinking of unjust enrichment. What monetary benefit do you think Schnucks received from your clients, from the banks, basically, the credit unions of the banks? The largest portion of Schnucks revenue is through card payment services. The benefit they received was they make $2.7 billion in revenue annually. So is gross revenue the unjust enrichment? A portion of gross revenue derived from card payment services provided for by— What portion? I don't have those numbers, Your Honor. Theoretically. Oh, whatever portion of Schnucks revenue is derived from card payment services provided by my clients— Their gross revenue? Whatever portion of it is a benefit inured to Schnucks. Every payment a grocery shopper made with a card is the unjust enrichment you want to seek to recover? Is a benefit—no, no, no, that's not what I'm seeking. It's a recovery in damages, what I'm trying to ask you. What is the benefit that they have received? What's the unjust enrichment? I mean, most of those payments presumably are people paying their bills when they reach the checkout stand. I'm sorry, Your Honor, say that one more time. The money that they're getting through the cards, they don't really care. Actually, they'd probably rather get it in cash because then they get about 3 percent more, depending on what the merchant fee is. Undoubtedly, Your Honor. So how they're unjustly enriched when somebody tenders a Visa card and says, I'm paying on my Visa card, and they say swipe here and maybe you sign. Why is that an unjust enrichment? They're unjustly enriched at the expense of the consumer by receiving that card, but at the same time putting the consumer at risk by not safeguarding that information by implementing industry standards. Newberry has been met with some skepticism in cases because, you know, the idea that you, the consumer, are factoring in the integrity of the payment system is pretty far-fetched, actually. Well, maybe another way of putting it then, Your Honor, is had Schnucks notified consumers that their payment processing system had been hacked for that two weeks that it knew it, would consumers patronize them? Yeah, that's different. A reasonable person would say no. All right. You need to finish. Yes, Your Honor. Thank you very much. Thank you very much. Thanks to both counsel. We'll take the case under advisement.